1

2

3                    IN THE UNITED STATES DISTRICT COURT

4

5                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

HONORIA CASTANON,                              No. C 05-03098 CW
7
          Plaintiff,                           ORDER DENYING
8                                              CROSS-MOTIONS FOR
       v.                                      SUMMARY JUDGMENT
9                                              AND GRANTING
JO ANNE B. BARNHART,                           PLAINTIFF'S
10                                             MOTION TO REMAND
          Defendant.
11
_____/
12

13

14       Plaintiff Honoria Castanon moves for summary judgment or for

15  remand on her claim that the Social Security Administration (SSA)

16  and Appeals council wrongly denied her Title II Disability Benefits

17  for the period April 16, 2001 to March 31, 2004.  Defendant Jo Anne

18  B. Barnhart, in her capacity as Commissioner of the SSA, opposes

19  this motion and cross-moves for summary judgment.  Having

20  considered all of the papers filed by the parties, the Court DENIES

21  the cross-motions for summary judgment and GRANTS Plaintiff's

22  motion to remand.

23                            BACKGROUND

24  I.  Procedural History

25       On September 13, 2001, Ms. Castanon filed her first

26  application for disability insurance benefits (DIB) under Title II

27  of the Social Security Act alleging that she became unable to work

28  on April 16, 2001 due to carpal tunnel syndrome (CTS) and residual

pain in her fingers and neck from past surgeries.  On February 4, 2002, the SSA denied the application.  Ms. Castanon did not appeal the determination.

On January 28, 2003, Ms. Castanon filed a second application for DIB alleging disability due to the same impairments and the same onset date of April 16, 2001.  After being denied initially and upon reconsideration by the SSA, Ms. Castanon requested a hearing before an administrative law judge (ALJ) which was held on May 24, 2004.  On September 23, 2004, the ALJ granted Ms. Castanon DIB as of April 1, 2004, the month in which she turned fifty-five, but found that Ms. Castanon was not disabled prior to that date. On June 20, 2005, the Appeals Council declined Ms. Castanon's request for review of the denial of benefits from April 16, 2001 through March 31, 2004.  Ms. Castanon commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

II.  Factual History

A.  Plaintiff's Education and Work Experience

Ms. Castanon was born in Mexico on April 1, 1949 and testified that she had completed the equivalent of a third grade education there.  (Administrative Record (AR) 316).  However, on her application for DIB, she reported that her highest education level was the fourth and sixth grades.  (AR 104, 121, 165, 280).  Ms. Castanon arrived in the United States in 1968 and attended one year of school where she learned "a little bit of English." (Id. at 316-17).  From November 28, 1971 until April 16, 2001, she was employed as a bottling line attendant by the Beringer Wine Company where she operated light machinery and performed custodial

United States District Court

For the Northern District of California

services.  (AR 318-19).  From April 16, 1998 through April 15, 2001, she was also employed by the Napa County In Home Support Services to provide in-home care for her disabled mother.  (AR 92).

B.  Plaintiff's Medical History

On April 16, 2001, while she was at work, Ms. Castanon noticed pain and swelling in both forearms.  (AR 225, 277).  On April 18, 2001, Ms. Castanon was examined by Dr. Patricia K. Stagg who ordered x-rays of Ms. Castanon's wrists and cervical spine.  The x-rays revealed no radiographic abnormalities of the wrists, but some interbody fusion and swelling of prevertebral soft tissue.  (AR 220).  Ms. Castanon was referred to Dr. Alan Kimelmann who performed a nerve conduction study which showed "[b]orderline right median nerve mononeuropathy at the wrist consistent with borderline carpal tunnel syndrome."  (AR 181-2).  On July 11, 2001 and August 22, 2001, Ms. Castanon underwent excision of a right dorsal wrist ganglion cyst and a right carpal tunnel release procedure.  (AR 218-9.)

On November 26, 2001, in a report to Safeco Insurance Company, Beringer's insurance carrier, Dr. Stagg diagnosed Ms. Castanon with bilateral arm tendinitis, right ganglionic cyst, and right CTS, and indicated that Ms. Castanon was precluded from repetitive forceful grasping bilaterally, was unable to perform her past work as a machine operator, and her disability status should be considered "Permanent and Stationary."  (AR 225-7).  From early 2000 until March, 2003, Ms. Castanon was also treated by Dr. Gary P. McCarthy. (AR 256).  In a June 14, 2002 report to Safeco Insurance Company, Dr. McCarthy wrote that Ms. Castanon is a "qualified injured worker

3

**United States District Court**
For the Northern District of California

and can no longer work on the bottling line" (AR 258) due to suffering from numbness, upper extremity pain, and neck pain. (AR 256).

On December 16, 2001, at request of the SSA, Ms. Castanon was examined by Dr. Jay Chun, a neurologist, who diagnosed her with, among other things, neck pain and bilateral hand pain secondary to CTS. (AR 241). Dr. Chun opined that Ms. Castanon could occasionally lift and carry ten pounds depending on her hand pain, was unrestricted with regard to sitting, standing and walking, but that she suffered from moderate to severe limitations in handling, feeling, grasping, and fingering due to CTS. (Id.)

In January, 2002, SSA Medical Consultant Dr. C. Richard Dann reviewed Ms. Castanon's medical records and concluded that she had a residual functional capacity (RFC)[1] to lift and carry twenty-five pounds frequently, to lift and carry fifty pounds occasionally with upper extremity limitations, and could sit and stand approximately six hours in an eight hour workday. (AR 244).

On June 26, 2003, at the request of the SSA, Dr. James M. Talcott, an orthopedic surgeon, examined and evaluated Ms. Castanon. (AR 259). Dr. Talcott diagnosed Ms. Castanon with bilateral CTS, musculoskeletal low back pain, and post-op cervical fusion. (AR 261). He also indicated, among other things, that Ms. Castanon was "unable to work and is essentially debilitated" and reported that she was precluded from repetitive use of her upper extremities, was unable to do forceful gripping and grasping, could

---

[1] Residual functional capacity is the most an individual can do despite his or her limitations. 20 C.F.R. § 404.1545.

4

sit, stand, and walk for up to four hours of an eight-hour workday, and could lift in excess of twenty pounds.  (AR 261).

On July 11, 2003, Dr. Buenor D. Puplampu, a qualified medical examiner, examined Ms. Castanon and diagnosed her with, among other things, right CTS, right dorsal ganglion cyst, and bilateral upper extremity tendinitis.  (AR 283).  Dr. Puplampu opined that because Ms. Castanon has some "permanent partial disability with respect to her repetitive strain injuries" that precludes "Repetitive Use of Both Upper Extremities," she could not return to work, and was a candidate for vocational rehabilitation.  (Id. at 284).

On July 30, 2003, Ms. Castanon's medical records were reviewed for the SSA by Dr. M. Mehrkhast who determined that Ms. Castanon had the following RFC: she could occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, and walk for six hours, but with no frequent gripping, grasping, typing, or fine manipulation.  (AR 264-6).

September 22, 2003 treatment notes from Dr. George Friedman, who treated Ms. Castanon from September, 2002 through January, 2004, indicate that Ms. Castanon complained of feeling depressed. (AR 289-292).  Dr. Friedman prescribed Paxil for the depression and recommended physical therapy.  (AR 288-91, 300).  According to Dr. Friedman's notes dated November 4, 2003, Ms. Castanon's depression improved after taking Paxil.  (AR 289).

C.  2003 Hearing

On May 24, 2004, a hearing was held before the ALJ at which Ms. Castanon, who was represented by counsel, testified.  (AR 19). A Spanish language interpreter translated for Ms. Castanon.  (AR

5

19).  A vocational expert (VE) also testified.  <u>Id.</u>  The ALJ posed three hypothetical questions to the VE.  The first hypothetical assumed "someone of the claimant's age, education, and experience, [with] the capacity for exertionally light work . . . with no repetitive forceful grasping bilaterally."  (AR at 333).  The VE responded that someone with this RFC could engage in Ms. Castanon's past work as a bottling line attendant because he did not consider a bottle of wine to be something that required forceful grasping.  (AR at 334).  The second hypothetical involved the same person but with the additional limitations of only occasional reaching, handling and fingering bilaterally.  <u>Id.</u>  The VE responded that the past work as a bottling line attendant would be eliminated, but listed jobs this hypothetical person could do such as Counter Clerk (DOT code 249-366.010), Gate Guard (372-667.030), Usher (DOT code 344-677.014), and Children's Attendant (DOT code 349-677.018).  (AR 334-7).

In the third hypothetical, the ALJ asked whether these jobs would be impacted by an individual's limited English ability.  AR at 338.  The ALJ clarified that this person would be able to communicate in English, but was not fluent in English.  <u>Id.</u>  The VE responded that, when accounting for the language limitations, the number of available jobs for photo counter clerk and gate guard would be impacted, the usher job would be severely impacted, and the child attendant job would be completely eliminated.  (AR 338-340).

D.  2003 ALJ Findings

On September 23, 2004, the ALJ issued his decision in which

United States District Court

For the Northern District of California

he concluded that, based on Medical-Vocation Rule 202.02, Ms. Castanon was disabled beginning on April 1, 2004 when she turned fifty-five.  However, based on Medical-Vocation Rule 202.10, he determined that Ms. Castanon was not disabled from April 16, 2001 through March 31, 2004 when she was fifty through fifty-four years old.  (AR 26).

At step one of the sequential evaluation,[2] the ALJ found that Ms. Castanon had not engaged in any substantial gainful activity since her alleged disability onset date of April 16, 2001.  (AR 20).  At step two, the ALJ found that Ms. Castanon suffered from medically "severe" impairments including CTS of the right wrist,

---

[2] To determine whether a claimant is disabled within the meaning of the Social Security Act, the Social Security Regulations set out a five-step sequential process.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998); Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991); 20 C.F.R. § 404.1520 (b)-(f).  The burden of proof is on the claimant in steps one through four.  Sanchez v. Sec'y of Health & Human Servs., 812 F.2d 509, 511 (9th Cir. 1987).  In step one, the claimant must show that she or he is not currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  In step two, the claimant must show that he or she has a "medically severe impairment or combination of impairments" that significantly limits his or her ability to work.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); 20 C.F.R. § 404.1520(c).  If the claimant does not, he or she is not disabled.  Otherwise, the process continues to step three for a determination of whether the impairment meets or equals a "listed" impairment which the regulations acknowledge to be so severe as to preclude substantial gainful activity.  Yuckert, 482 U.S. at 141; 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If this requirement is met, the claimant is conclusively presumed disabled; if not, the evaluation proceeds to step four.  At step four, it must be determined whether the claimant can still perform "past relevant work."  Yuckert, 482 U.S. at 141; 20 C.F.R. § 404.1520(e).  If the claimant can perform such work, he or she is not disabled.  If the claimant meets the burden of establishing an inability to perform prior work, the burden of proof shifts to the Commissioner for step five.  At step five, the Commissioner must show that the claimant can perform other substantial gainful work that exists in the national economy.  Yuckert, 482 U.S. at 141; 20 C.F.R. § 1520(f).

bilateral tendinitis, obesity, and post cervical fusion.  (AR 22).
The ALJ found that Ms. Castanon's depression did not qualify as a
severe impairment because she did not receive treatment
specifically for depression, nor was it separately diagnosed as a
medical illness by any of her treating or examining physicians. (AR
22).

At step four of the sequential analysis, the ALJ indicated
that he accorded more weight to the opinions of Ms. Castanon's
treating physicians than to the opinions of the examining and non-
examining physicians, but he did not accord them controlling weight
"because the sitting/standing/walking limitations given in Exhibit
8F [orthopedic consultant Dr. Talcott's opinion that Ms. Castanon
can sit, stand and walk four hours out of an eight hour day] were
too restrictive in light of the objective evidence; and the 10
pound maximum (Exhibit 4F) [neurologic consultant Dr. Chun's
opinion that Ms. Castanon can carry occasionally ten pounds] was
likewise too restrictive, whereas the estimate that claimant is
capable of medium work activity is too liberal.  My RFC is a
compromise, over time, based on the actual objective evidence and
testimony." (AR 23).  The ALJ concluded that Ms. Castanon has the
RFC to perform a light level of work activity[3] with manipulative

---

[3] Light work involves lifting no more than twenty pounds at a
time with frequent lifting or carrying of objects weighing up to
ten pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls. To be considered
capable of performing a full or wide range of light work, the
claimant must have the ability to do substantially all of these
activities.  20 C.F.R. § 404.1567(b).  Light work requires standing
or walking, off and on, for a total of approximately six hours of

limitations allowing only occasional reaching, handling, and fingering bilaterally.  (AR 23, 25).  Based on the testimony of the VE, the ALJ found that Ms. Castanon lacked the RFC to perform the requirements of her prior relevant work (PRW) as a bottling line attendant.  (AR 24).

At step five, the ALJ concluded that Ms. Castanon's claim that she is illiterate in English is unfounded.  (AR 23).  For this conclusion, the ALJ relied on the following evidence:  (1) Ms. Castanon resided in the United States for more than thirty years; (2) she has been described or has described herself as having basic English skills [May 16, 2003 Vocational Testing Report], having limited English skills [Vocational Rehabilitation Progress Report covering period April 4, 2003 through May 23, 2003], having the ability to read and write English [Disability Report Application] and speaking English pretty well [August 21, 2001 and December 5, 2002 Observations of SSA Phone Interviewer]; (3) a March 11, 2004 vocational testing report mentioned no language limitations, though it did refer to various documents that are available in Spanish, and reported that Ms. Castanon initiated and engaged in interpersonal relations with others at the evaluation center with no mention of language restrictions; and (4) Ms. Castanon answered compound questions at the hearing prior to translation and even corrected the English translation provided by the interpreter at one point.  The ALJ concluded that because Ms. Castanon's capacity for the full range of light work was reduced by the additional

_____

an eight-hour workday.  SSR 83-10 at 5-6.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

limitations of advanced age, marginal education, and unskilled work
background which narrowed the range of work she can perform, she
was disabled for "the period beginning April 1, 2004, the month
claimant attained age 55," based on Medical-Vocational Rule 202.02,
but she was not disabled prior to that date.  (AR 24-5).

LEGAL STANDARD

I.  Overturning a Denial of Benefits

A court cannot set aside a denial of benefits unless the ALJ's
findings are based upon legal error or are not supported by
substantial evidence in the record as a whole.  42 U.S.C. § 405(g);
Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989); Martinez v.
Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  Substantial evidence
is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.  Richardson v. Perales, 402 U.S.
389, 401 (1971); Orteza v. Shalala, 50 F.3d 748, 749 (9th Cir.
1995).  It is more than a scintilla but less than a preponderance.
Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

To determine whether substantial evidence exists to support
the ALJ's decision, a court reviews the record as a whole, not just
the evidence supporting the decision of the ALJ.  Walker v.
Matthews, 546 F.2d 814, 818 (9th Cir. 1976).  A court may not
affirm the ALJ's decision simply by isolating a specific quantum of
supporting evidence.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir.
1989).  In short, a court must weigh the evidence that supports the
Commissioner's conclusions and that which does not.  Martinez, 807
F.2d at 772.

If there is substantial evidence to support the decision of

10

United States District Court

For the Northern District of California

the ALJ, it is well-settled that the decision must be upheld even when there is evidence on the other side, <u>Hall v. Sec'y of Health, Educ. & Welfare</u>, 602 F.2d 1372, 1374 (9th Cir. 1979), or when the evidence is susceptible to more than one rational interpretation, <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir. 1984).  If supported by substantial evidence, the findings of the ALJ as to any fact will be conclusive.  42 U.S.C. § 405(g); <u>Vidal v. Harris</u>, 637 F.2d 710, 712 (9th Cir. 1981).

II.  Establishing Disability Under the Social Security Act

Under the Social Security Act, "disability" means:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 423 (d)(1)(A).  The impairment must be so severe that the claimant "is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work." 42 U.S.C. § 423(d)(2)(A).  In addition, the impairment must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory techniques."  42 U.S.C. § 423(d)(3).

DISCUSSION

I.  ALJ's Assessment of Ms. Castanon's Education and Literacy

Ms. Castanon appeals the ALJ's finding, based on Medical-Vocational Guideline Rule 202.10, that she is a person with a marginal education, as opposed to one who is illiterate in English. The Commissioner argues that the evidence in the record is sufficient to sustain the ALJ's finding that Ms. Castanon has a

marginal education and is not illiterate, and thus was not disabled
between the ages of fifty and fifty-four.

A.  Legal Standard

The Medical-Vocational Guidelines are administrative tools that
the Commissioner may use at step five of the disability evaluation.
Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988).  Based on
age, education, work experience, and "exertional capacity," the
guidelines determine the employability of claimants with
"substantially uniform levels of impairment."  Id.; see also 20
C.F.R. pt. 404, subpt. P, app. 2.

Medical-Vocational Guidelines (Grids) Rule 202.00(c) provides
that a claimant who is limited to light work, is past the age of
fifty-five years old, and has a history of unskilled work
experience, is disabled.  20 C.F.R. pt. 404, subpt. P, app. 2.  Rule
202.00(d) provides that a claimant who possesses the same
characteristics as described in Rule 202.00(c), but who is between
the ages of fifty and fifty-four years old, and who is illiterate or
unable to communicate in English, is disabled.  Id.  The word "or"
in Rule 202.00(d) is to be construed as encompassing a person who is
illiterate in English or who is unable to communicate in English, or
both.  Chavez v. Department of Health and Human Services, 103 F.3d
849, 852 (9th Cir. 1996); Silveira v. Apfel, 204 F.3d 1257, 1262
n.13 (9th Cir. 2000).  Illiteracy is defined as "the inability to
read or write" in English.  20 C.F.R. § 404.1564(b)(1) and (5).
Generally, an illiterate person "cannot read or write a simple
message such as instructions or inventory lists, even though the
person can sign his or her name."  Id.  "The ability to communicate

12

United States District Court

For the Northern District of California

in English" is defined as "the ability to speak, read, and understand English."   20 C.F.R. § 404.1564(b)(5).

Rule 202.10 provides that a claimant who is limited to light work, is between the ages of fifty and fifty-four years old, has a history of unskilled work experience, and whose education is "[l]imited or less - [a]t least literate and able to communicate in English," is not disabled.   Id.

B.  Analysis

In order for the ALJ to have concluded that Grid Rule 202.00(d) did not apply to Ms. Castanon, he would have had to find that she was able to communicate in English and that she was literate in English.   To conclude that Ms. Castanon was literate in English, he would have had to find that she could read and write simple messages, such as instructions or inventory lists.   The evidence relied on by the ALJ arguably may have demonstrated that she was able to speak and understand English, but it did not demonstrate that she could read or write simple instructions in English.   The first vocational report cited by the ALJ, AR 141, stated that Ms. Castanon could understand basic words and basic written materials in English.   However, it did not state that Ms. Castanon could write basic instructions in English.   Furthermore, this same report indicated that the supervisor assigned to Ms Castanon was Spanish-speaking, that the instructions given to her were in Spanish and that the job application she was given to fill out was in Spanish. AR 140-41.   The second vocational report cited by the ALJ, AR 162, indicated that Ms. Castanon is a very limited English speaker. These reports do not support the conclusion that Ms. Castanon can

13

read and write instructions and inventory lists in English.

The third document relied upon by the ALJ, AR 97, is the SSA Disability Report form, on which Ms. Castanon, or someone filling the form out for her, checked a box indicating that she can read English and that she can write more than her name in English. However, on the same form, Ms. Castanon did not check the box that she could speak English, but checked the box indicating that she spoke Spanish.  The fact that these boxes were checked does not establish that Ms. Castanon can read or write simple instructions or inventory lists in English.  The ALJ also relied on two reports of an SSA interviewer who spoke to Ms. Castanon over the telephone, AR 95 and 113, who thought Ms. Castanon spoke English "pretty well." Although this evidence may establish that Ms. Castanon can speak and understand English, it does not address her ability to read or write in English.  The last two items relied upon by the ALJ, the fact that she was able to interact with other people at the vocational rehabilitation center, and the fact that, at the hearing, she may have understood a question in English before she heard the translation, also does not address her ability to read and write in English.

Evidence in the record contradicts the ALJ's conclusion that Ms. Castanon is literate in English.  Two vocational evaluation reports specify that Ms. Castanon "has some English comprehension, but is not fluent in English," "has limited reading/writing skills in English" (AR 164), and is a very limited English speaker (AR 162).  A May 16, 2003 vocational testing report indicates that Ms. Castanon was given an application form in Spanish that was

structured like a job application. (AR 140). The same report indicated that although Ms. Castanon was able to understand basic words in English, basic oral directions in English and basic written materials in English, she was assigned a Spanish-speaking supervisor, and the summary concluded that Ms. Castanon was not a tenable candidate for vocational rehabilitation due, in part, to her below average verbal skills in English. (AR at 141, 143). Another vocational status report indicated that Ms. Castanon did not have the English skill level to pass a school bus driving test. (AR at 161). Two physicians reported that they used Spanish language interpreters when examining Ms. Castanon. (AR 251 ("Part of the history was obtained using my rudimentary Spanish, and the remainder of the history was done when the interpreter arrived late") and AR 277 ("Ms. Castanon is not fluent in English. Therefore, we had the help of Mr. Estrada, who did the translation from Spanish to English for this evaluation.").

The ALJ failed to address the evidence, cited above, that indicated that Ms. Castanon had poor English skills. Finally, although the record contains a substantial number of medical and vocational forms filled out by hand (AR 97-106, 114-123, 124-129), the ALJ failed to establish whether Ms. Castanon completed these herself without assistance.

The Commissioner bears the burden of establishing that Ms. Castanon is literate and the ALJ made no express finding that Ms. Castanon could read and write in English. At present, there is insufficient evidence in the record to determine whether or not Ms. Castanon is literate in English.

15

**United States District Court**

For the Northern District of California

Accordingly, this issue is remanded to the Commissioner to determine whether Ms. Castanon is literate, that is, that there is substantial evidence that she can read and write at least simple instructions or inventory lists in English.

II.   ALJ's Identification of Other Substantial Gainful Work

Ms. Castanon argues that, at step five, the ALJ improperly concluded that she could do other substantial work because he relied on jobs the VE identified which were beyond her skill level based on the general education development (GED) requirements listed in the Dictionary of Occupational Titles (DOT).  Ms. Castanon also objects to being denied an opportunity to cross-examine the VE about the GED requirements for each job he suggested.  The Commissioner contends that Ms. Castanon fails to refute that her past work as a bottling line attendant demonstrates that she has the GED requirements of the jobs suggested by the VE.

If a claimant shows that he or she cannot return to his or her previous job, the burden of proof shifts to the government to show that the clamant can do other kinds of work.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Without other reliable evidence of a claimant's ability to perform specific jobs, the government must use a vocational expert to meet that burden.  Id.  If the GED levels of the VE's suggested jobs fail to comport with a claimant's noted limitations and RFC, the ALJ must definitively explain this deviation.  Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001).

The ALJ posed two hypotheticals to the vocational expert.  Both hypotheticals were based on Ms. Castanon's age, education, and past work experience, and differed only in degree and frequency of manual

16

**United States District Court**

For the Northern District of California

1    manipulation (AR 332).  For his conclusion that Ms. Castanon was not

2    disabled prior to age fifty-five, the ALJ relied on the VE's

3    testimony that, even with the limitations in grasping and

4    manipulating, Ms. Castanon was eligible for jobs such as children's

5    attendant, usher, photo counter clerk, and gate guard.  (AR 334-7).

6        The GED requirements of Ms. Castanon's prior job as a bottling

7    line attendant are R1, M1, and L1.[4]  The GED requirements of the

8    VE's suggested jobs are higher:  (1) photo counter clerk: R2, M2 and

9    L2; (2) gate guard: R3, M2 and L2; (3) usher: R2, M1, and L1; and

10   children's monitor: R2, M1 and L1.[5]

11       The ALJ did not make any findings regarding Ms. Castanon's

12   reasoning, mathematical or language abilities.  Thus, there is no

13   ───────────────────

14       [4] According to Appendix C of the Dictionary of Occupational
     Titles (DOT), the GED embraces those aspects of education (formal
15   and informal) which are required of the worker for satisfactory job
     performance.  The GED Scale is composed of three divisions:
16   Reasoning Development (R), Mathematical Development (M), and
     Language Development (L).

17       [5] Appendix C of DOT indicates that R1 requires enough
     commonsense understanding to carry out simple one- or two-step
18   instructions and the ability to deal with standardized situations
     with occasional or no variables from these situations encountered
19   on the job.  R2 requires enough commonsense understanding to carry
     out detailed but uninvolved written or oral instructions and an
20   ability to deal with problems involving a few concrete variables
     from standardized situations.  R3 requires, among other things,
21   enough commonsense understanding to carry out instructions
     furnished in written, oral, or diagrammatic form.  L1 requires the
22   recognition of 2,500 (two or three syllable) words and a reading
     rate of 95-120 words per minute.  L2 requires, among other things,
23   a passive vocabulary of 5,000 to 6,000 words and a reading rate of
     190-215 words per minute.  M1 requires, among other things, the
24   ability to add and subtract two digit numbers, multiply and divide
     by 10's and 100's by 2, 3, 4, and 5, perform the four basic
25   arithmetic operations with coins as part of a dollar, and perform
     operations with units such as cup, pint, and quart; inch, foot, and
26   yard; and ounce and pound.  M2 requires, among other things, the
     ability to add, subtract, multiply, and divide, compute ratios,
27   rates, and percentages; and draw and interpret bar graphs.  Id.

28
                                    17

determination of Ms. Castanon's reasoning capacity for detailed written or oral instructions as required by R2 or whether her passive vocabulary exceeds 5,000 English words or if she can read at the estimated rate of 190-215 words per minute as required by L2. There is minimal evidence in the record of Ms. Castanon's mathematical skills. During a May 5, 2003 Vocational Testing evaluation, she was unable to perform on any math test because "she didn't know any math" (AR 141). This evaluation also stated Ms. Castanon had "no technical numerical skills," and "below average clerical comprehension." However, a February 17, 2004 Vocational Testing evaluation reported that Ms. Castanon successfully operated a commercial electronic cash register, calculated multi-item purchases, computed sales tax, and made accurate change. (AR 156). Nonetheless, there is no substantial evidence that Ms. Castanon can "compute ratios, rates, and percentages; and draw and interpret bar graphs" as required by M2.

Furthermore, Plaintiff correctly points out that, at the hearing before the ALJ, she was denied the opportunity to cross-examine the VE regarding the GED levels of the jobs he was suggesting. See AR 344.

The Commissioner's argument that the ALJ was not required to make findings on the GED levels of the VE's suggested jobs because they are comparable to Ms. Castanon's past work as a bottling line attendant is unpersuasive. As discussed above, the requirements of each suggested job are higher in at least one of the GED areas.

Because the ALJ failed to explain whether Ms. Castanon was capable of performing the VE's suggested jobs, this issue is

18

1  remanded to the Commissioner.

2  III.   ALJ's Consideration of Depression

3      Ms. Castanon challenges the ALJ's step two determination that

4  her depression was not a "severe impairment" and argues that his

5  exclusion of it in his hypotheticals to the vocational expert

6  constitutes error.  The Commissioner argues that Ms. Castanon

7  produced no evidence that her depression interfered with her ability

8  to work and therefore she has not satisfied her burden of proving

9  mental disability.

10     A severe mental impairment is one that significantly limits an

11 individual's physical or mental ability to do basic work activities.

12 20 C.F.R. § 404.1521(a)(2003).  The determination at step two of

13 whether a mental impairment is severe is meant to identify at an

14 early stage those claimants whose medical impairments are so slight

15 that it is unlikely they would be found to be disabled even if their

16 age, education, and experience were taken into account.  Bowen v.

17 Yuckert, 482 U.S. 137, 140, 153 (1987).  The ALJ has a duty to

18 develop the record fully and fairly, even when the claimant is

19 represented by counsel.  Tonapetyan v. Halter, 242 F.3d 1144, 1150

20 (9th Cir. 2001).  This duty is heightened where the claimant may be

21 mentally ill.  Id.

22     After reviewing Ms. Castanon's medical records, the ALJ

23 concluded that her depression was not a severe impairment because

24 she received no treatment specifically for depression and it was not

25 diagnosed as a medical illness by any of her treating or examining

26 physicians.  (AR 22).

27     Although the record shows that Dr. Friedman, one of Ms.

28

**United States District Court**

For the Northern District of California

Castanon's treating physicians, treated Ms. Castanon for depression, substantial evidence supports the ALJ's conclusion that Ms. Castanon's depression was not severe.  Dr. Friedman addressed depression in his treatment notes dating from 2002 and 2003.  (AR 286-300).  On September 22, 2003, Dr. Friedman prescribed the antidepressant Paxil.  (AR 291).  On November 4, 2003, his notes indicate that Ms. Castanon's depression improved after treatment with Paxil.  (AR 289).

Significantly, on the disability reports Ms. Castanon filled out as part of her application for Social Security benefits, she did not indicate depression as a condition that limited her ability to work or required treatment (AR 98, 105, 115).  Also, on a Reconsideration Disability Report form, dated September 11, 2003, Ms. Castanon did not indicate that depression was a physical or mental condition.  (AR 132).  Two Vocational Testing Reports dated May, 2003 and February, 2004 made no mention of depressive symptoms and indicated that Ms. Castanon "appeared motivated with recognition for good work performance," (AR 141), "demonstrated an even disposition," (AR 156), along with "many worker traits, habits, and behaviors associated with competitive employment" (AR 143) and was "a cooperative individual who got along well with staff." (AR 143).

There are only two mentions of depression in the record that the Court could find, other than Dr. Friedman's notes.  The first is Ms. Castanon's indication, in a Daily Activities Questionnaire, that she takes Paxil for "pain and stress."  (AR 148).  The second is on an Exertional Daily Activities Questionnaire, dated May 13, 2003, in which Ms. Castanon indicated she was depressed as a result of

20

**United States District Court**

For the Northern District of California

1   over-dependence on family and being unable to stop the pain. (AR

2   129).

3       Based on all of the evidence, the ALJ's determination that Ms.

4   Castanon's depression was not a severe impairment because it did not

5   interfere with her ability to work is supported by substantial

6   evidence.

7       Ms. Castanon cites <u>Mayes v. Massanari</u>, 276 F.3d 453 (9th Cir.

8   2001) for the proposition that to the extent that the record is

9   ambiguous or inadequate, the ALJ has a duty to develop it.  However,

10  here, the ALJ had no duty to develop the record because it was

11  neither ambiguous nor inadequate to allow for proper evaluation of

12  the evidence.  Although the ALJ did not mention that Dr. Friedman

13  treated Ms. Castanon for depression with Paxil, Dr. Friedman's

14  follow-up note indicated that her depression improved with Paxil.

15  Thus, the fact that Dr. Friedman prescribed Paxil is not evidence

16  that Ms. Castanon's depression limited her ability to engage in

17  basic work activities.  Ms. Castanon's claim that the ALJ erred

18  regarding his determination that her depression was a severe

19  impairment is unavailing.

20  IV.  ALJ's Consideration of Examining Physicians

21      Ms. Castanon argues that the ALJ, in determining her RFC,

22  improperly rejected the opinions of examining physicians Dr. Chun

23  and Dr. Talcott regarding her capacity for lifting and for standing

24  and sitting.

25      A. Legal Standard

26      The Ninth Circuit distinguishes among the opinions of three

27  types of physicians:  treating physicians, examining physicians, and

28                                    21

United States District Court

For the Northern District of California

non-examining physicians.  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  <u>Id.</u>  Where there are contradictions between the opinions of the treating physician and others, the ALJ must detail specific and legitimate reasons supported by substantial evidence to reject the opinion of the treating physician.  <u>Id.</u>  If the treating physician's opinion is "brief, conclusory, and inadequately supported by objective signs and laboratory findings," it is appropriate to reject it.  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 750, 754 (9th Cir. 1989).  The examining doctor is entitled to less weight than a treating doctor and more weight than a non-examining doctor, but may still only be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record."  <u>Lester</u>, 81 F.3d at 830-31.  Also like the treating doctor, an uncontradicted opinion of an examining doctor can only be rejected by providing "clear and convincing reasons."  <u>Id.</u>  The reports of consulting, non-examining physicians should be discounted and not treated as substantial evidence when contradicted by other evidence.  <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 n.4 (9th Cir. 1990); <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1454 (9th Cir. 1984).  A medical opinion may be contradicted by non-medical evidence such as testimony.  <u>Id.</u> at 831.  Although the ALJ may decide between conflicting evidence, he may not simply substitute his own medical opinion for that reflected in the evidence.  <u>Embrey v. Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988); <u>Marcia v. Sullivan</u>, 900 F.2d 172, 177 n.6 (9th Cir. 1990).

**United States District Court**
For the Northern District of California

B.  Analysis

Ms. Castanon's treating physicians did not indicate any limitations regarding lifting, sitting or standing.  Dr. Chun, one of Ms. Castanon's examining physicians, opined that Ms. Castanon was capable of "occasionally lifting and carrying ten pounds."  (AR 242).  Dr. Chun also concluded that Ms. Castanon's ability to stand, walk and sit was unrestricted.  Id.  Dr. Talcott, another examining physician, indicated Ms. Castanon was able to lift in excess of twenty pounds, but was only able to lift any amount on an intermittent basis.  (AR 261).  Dr. Talcott also indicated that Ms. Castanon could sit, stand, and walk for up to four hours of an eight-hour workday.  Id.  Dr. Dann, a non-examining physician, believed that Ms. Castanon was "capable of frequently lifting and carrying twenty-five pounds, [and] occasionally lifting and carrying fifty pounds with upper extremity limitations." (AR 244)  Dr. Mehrkhast, another non-examining physician, indicated that Ms. Castanon could "occasionally lift twenty pounds [and] frequently lift ten pounds."  (AR 264-6).  Drs. Dann and Mehrkhast indicated that Ms. Castanon could sit and stand about six hours in an eight-hour workday.  (AR 244, 264).

1. Lifting Limitation

By concluding that Ms. Castanon was capable of light work, the ALJ found that she could frequently lift and carry objects weighing up to ten pounds and she could infrequently lift objects weighing up to twenty pounds.  The ALJ correctly found that the opinions of Plaintiff's treating physicians, who did not provide any lifting limitations, were more persuasive than the consultative and

23

United States District Court

For the Northern District of California

examining physicians.  Also, the ALJ correctly determined that the treating sources' opinions were not determinative because all of the examining and consultative physicians had opined that Plaintiff had some lifting limitation.  With the exception of Dr. Chun, all examining and consulting physicians opined that Plaintiff could lift more than twenty pounds.  Therefore, the ALJ's conclusion that Plaintiff could lift twenty pounds occasionally and ten pounds frequently was reasonable based on the medical records as a whole.

Ms. Castanon argues that, in determining her lifting RFC, the ALJ adopted the opinion of the consultative physicians over the opinions of the examining physicians.  However, Ms. Castanon's argument ignores the fact that her treating physicians did not indicate any lifting restrictions for her.  The ALJ, therefore, was not only comparing the examining physicians' opinions with those of the consultants; he was also comparing her treating physicians' opinions with those of the other doctors and thus had to determine what her RFC was from opinions ranging from no lifting limitations to an opinion stating she could only lift ten pounds.  Therefore, the ALJ's opinion was a proper resolution of conflicting medical opinions.

2. Sitting, Standing and Walking Limitations

Ms. Castanon does not respond to the Commissioner regarding the ALJ's determination of her sitting, standing and walking RFC. Therefore, she may have conceded it.  Nevertheless, the Court concludes that the ALJ properly found that Ms. Castanon has no sitting, standing or walking limitations.

Dr. Chun and both consulting physicians indicated that Ms.

24

Castanon could stand or walk six hours in an eight-hour workday. Only Dr. Talcott concluded that Ms. Castanon was limited in this area. Ms. Castanon's treating physicians indicated no limitations in this area. Thus, the ALJ's assessment that Ms. Castanon could stand or walk for six hours in an eight-hour day was a proper resolution of conflicting medical opinions.

IV. ALJ Failed to Conduct Proper RFC Determination

Ms. Castanon argues that the ALJ's reasons for his RFC, that it was "a compromise, over time, based on the actual objective evidence and testimony" falls short of the type of analysis the regulations require.

As discussed above, the ALJ properly determined Ms. Castanon's RFC by resolving conflicting medical opinions. Therefore, this claim is unavailing.

V. Remand for Reconsideration

Ms. Castanon asks the Court to reverse and award benefits or remand for reconsideration.

The Court has discretion to remand the case for further administrative proceedings or to award payment of benefits. Swenson, 876 F.2d at 689. An award of benefits is appropriate where no useful purpose would be served by further administrative proceedings or when the record has been fully developed and there is insufficient evidence to support the ALJ's conclusion. Rodriquez, 876 F.2d at 763. Where remand would only delay the receipt of benefits, judgment for the plaintiff is appropriate. Id. However, remand for further proceedings is appropriate where additional proceedings could remedy defects. Id.

**United States District Court**

For the Northern District of California

1    At step five of the sequential evaluation process, the ALJ
2 determined that Ms. Castanon was not illiterate.  In doing so, the
3 ALJ failed to establish with substantial evidence that Ms. Castanon
4 could read or write English.  Furthermore, the ALJ did not explain
5 whether Ms. Castanon is able to perform the DOT requirements for the
6 jobs he indicated are available to her.  Because the ALJ may be able
7 to remedy these deficiencies, remand is the proper remedy.

8    The Court reverses the ALJ's decision and remands Plaintiff's
9 claim for further proceedings consistent with the Court's findings.

10                            CONCLUSION

11    For the foregoing reasons, the Court denies both parties'
12 cross-motions for summary judgment, and grants Ms. Castanon's motion
13 to remand for further proceedings as instructed.

14    IT IS SO ORDERED.

15

16 Dated: 7/14/06

17                            _____
18                            CLAUDIA WILKEN
                             United States District Judge
19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California